UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> DARRELL CEDRIC DENT, *et al.*, <br><br> Defendants. | Case No.: SACR 16-00029(B)-CJC <br><br> **ORDER DENYING DEFENDANTS' MOTION TO PROVIDE DISCOVERY (TO VACATE PROTECTIVE ORDERS)** |

**I. INTRODUCTION**

Defendants Keith Marvel Walton, Robert Wesley Johnson, Justin Marques Henning, Jameson LaForest, Jeremy Tillett, Michael Germeille, Darrell Cedric Dent, Evan Kwan Scott, Kenneth Paul, and Marshawn Marshall are charged with various violations of 18 U.S.C. § 1951(a) (conspiracy to interfere with commerce by robbery and

interference with commerce by robbery) and 18 U.S.C. § 924(c) (discharging and brandishing firearms in furtherance of crimes of violence) in connection with a series of "smash-and-grab" style robberies of jewelry stores in the Central District of California. (*See generally* Dkt. 248 (Second Superseding Indictment, hereinafter "SSI").) Before the Court is Defendant Walton's motion to vacate existing protective orders concerning discovery, styled as a "motion to provide discovery." (Dkt. 360 [Motion, hereinafter "Mot."].) Defendants Tillett, Johnson, Henning, LaForest, and Germeille join the motion.1 (Dkts. 361, 364, 377, 390, 395.) For the following reasons, the motion is DENIED.

## II.  BACKGROUND

On November 16, 2016, the government filed the SSI in this case, bringing thirteen counts under 18 U.S.C. § 1951(a) and 18 U.S.C. § 924(c) in connection with Defendants' alleged conspiracy to perpetrate a series of jewelry store and watch boutique robberies. (*See generally* SSI.) According to the SSI, various members of the conspiracy would identify a store to be robbed, recruit co-conspirators to perform the robbery ("including by promising large sums of money to young men who were financially desperate"), surveil the store, provide equipment and disguises, arrange for transportation to and from the store, and assign roles to each participant, which often involved using firearms and smashing glass display cases containing valuables. (*Id.* at 3–5.) Defendants allegedly have significant ties, or are members of, the Inglewood Family Gangster Bloods gang (the "Inglewood Family"). (Dkt. 412 at 3–6.)

Between July 2016 and January 2017, the government and various Defendants in this case entered into a series of identical stipulations requesting that the Court issue

---

1 Henning, Tillett, and LaForest's requests for joinder, (Dkts. 361, 364, 377), are GRANTED.

protective orders concerning discovery related to cooperating witnesses, (Dkts. 103, 122, 294, 389), which the Court granted, (Dkts. 104, 126, 300, 394 [hereinafter the "Protective Orders"]). The Protective Orders place restrictions on the dissemination and disclosure of documents that "contain the identity, individually identifiable information, or the statements of cooperating witnesses, including the reports of investigation documenting interviews with cooperating witnesses, recordings of interviews of cooperating witnesses, documents concerning efforts to ensure the safety of cooperating witnesses and cooperating witnesses' families, plea agreements of cooperating witnesses, and related documents" (hereinafter "Protected Information"). (*See, e.g.*, Dkt. 104 ¶ 1.) Under the Protective Orders, Defendants may review such Protected Information in the presence of their counsel (or a designated representative), but may not possess copies of such documents on their own. (*Id.* ¶ 4.) According to the government, this was part of a compromise to provide Defendants and their counsel with cooperating witness discovery "long before the government was obligated to produce it." (Dkt. 408 [Opposition, hereinafter "Opp."] at 4.)

Walton's prior counsel agreed to the stipulation concerning the Protective Orders. However, months later at a pre-trial conference held on December 19, 2016, Walton claimed that he did not have adequate access to all discovery. Walton's new counsel claims that "Mr. Walton denies having given his previous counsel approval or authorization to sign the Stipulation on his behalf. On the contrary, Mr. Walton specifically objected to the Stipulation." (Mot. at 1 n.1.) This objection was not brought to the Court's attention, however,[2] and the other Defendants never contended that they did not agree to their stipulations. (*See* Dkts. 361, 364, 377, 390, 395.) At the December 19 pre-trial conference, the Court advised the parties to meet and confer to try to resolve Walton's concerns, but they were unable to do so.

---

[2] Walton had filed a pro se motion alleging misconduct by his prior attorney on September 2, 2016, but did not raise any objection to the Protective Orders at that time. (*See* Dkt. 179.)

After the Protective Orders were entered, the government produced nearly 60,000 pages of discovery and fifty-five gigabytes of video recordings. (Mot. at 5; Opp. at 5–6.) In his motion, Walton states that approximately 11,676 pages of that discovery are subject to the Protective Orders. (Mot. at 5.) However, as a result of the December 19, 2016, pre-trial conference, the government "devoted considerable resources to conducting a detailed review of each and every page of protected information in an effort to reduce the volume of restricted discovery." (Opp. at 8.) After Walton filed the present motion, the government de-designated most of the documents previously classified as Protected Information—now only approximately 1,100 pages are covered by the Protective Orders. (*Id.* at 9.) These remaining documents consist of roughly "114 unique pages of interview and proffer statements of cooperating witnesses; 569 pages of plea agreements and plea agreement-related materials (such as change of plea transcripts and correspondence, and proffer agreements); and roughly 140 pages of cooperator statements set forth in various court filings, including search warrant application, historical cell site applications, and similar documents." (*Id.* at 10.) The government maintains that some of the de-designated documents still fall within the scope of the Protective Orders, but explains that it chose to de-designate them in order to keep only the "bare minimum" of documents protected. (*Id.* at 8.) Walton, however, insists that the Protective Orders do not allow him and his counsel to adequately prepare their defense because they prevent Walton from fully processing critical information. (Mot. at 6.)

Even after the government de-designated the majority of Protected Information, the parties were unable to come to an agreement regarding Walton's concerns. The government offered to place a portable hard drive containing all discovery at the law library of each floor of the Metropolitan Detention Center ("MDC"), but Walton's counsel claims this is unworkable because the inmates are limited to one hour per week in the law library. (Mot. at 3.) The government maintains that, according to MDC counsel, inmates are permitted three hours per week at the law library, not one. (Opp. at

7 n.8.)  Defense counsel's counter-proposal was to give each defendant a personal portable hard drive that could be accessed at their convenience in MDC's common rooms, but the government rejected this proposal because MDC regulations do not allow inmates to possess external hard drives (which could be disassembled and used for improper purposes), MDC counsel states that computers in the common room likely do not have USB ports, and other inmates could gain access to the hard drives.  (Mot. at 3–4; Opp. at 7–8.)

Trial in this case is currently set for August 15, 2017, five months from now.

## III.  DISCUSSION

Federal Rule of Criminal Procedure 16(a)(1)(E) provides that "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant."  The Jencks Act further provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.  If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use."  18 U.S.C. § 3500.

On the other hand, "[a]t any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.  The court may permit a

party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal." Fed. R. Crim. P. 16(d)(1). In determining whether a protective order is appropriate, courts consider factors such as the "'safety of witnesses and others, a particular danger of perjury or witness intimidation, the protection of information vital to national security, and the protection of business enterprises from economic reprisals.'" *United States v. Stone*, No. CR12-0072-JCC-GSA, 2014 WL 788349, at *2 (E.D. Cal. Feb. 25, 2014) (quoting 2 Charles Alan Wright *et al.*, Federal Practice & Procedure Criminal § 262 (4th ed. 2013)). Rule 16's advisory committee notes further provide that "it is obvious that [a protective order] would be appropriate where there is reason to believe that a witness would be subject to physical or economic harm if his identity is revealed." Fed. R. Crim. P. 16 advisory committee's note to 1974 amendments; *see also United States v. Barbeito*, No. CR.A. 2:09-CR-00222, 2009 WL 3645063, at *1 (S.D.W. Va. Oct. 30, 2009) ("It is appropriate, however, to employ Rule 16(d) protective orders to curtail the public dissemination of sensitive discovery materials that may endanger witnesses or informants.").

The government maintains that by "producing from the outset unredacted discovery that disclosed both the identities and statements of cooperating witnesses, the government has exceeded its discovery obligations under the Federal Rules of Criminal Procedure and relevant case law governing the disclosure of that material." (Opp. at 11 (citing Fed. R. Crim P. 16(a)(1)(E); *United States v. Walk*, 533 F.2d 417, 419 (9th Cir. 1975) (explaining that Jencks Act discovery, even if material to the defense, cannot be compelled until a witness has testified on direct examination); and *United States v. Bonilla*, 615 F.2d 1262, 1264 (9th Cir. 1980) (finding government may rightfully withhold the identity of a cooperating witness until ten days before trial).) The government made these early disclosures specifically in reliance on the safeguards afforded to the cooperating witnesses in the Protective Orders. (*Id.*) However, Walton

argues that because Defendants cannot keep physical copies of the Protected Information, those documents must be read to Defendants, which is "simply not practical" given the "voluminous nature of the discovery," and prevents Defendants from "fully digest[ing] and contemplate[ing] the significance of the discovery." (Mot. at 6.) He contends that due to the Protective Orders, "a single reading of the discovery is, frankly, all that can be hoped for." (*Id.*) After Walton filed his motion, roughly 10,576 of the 11,676 pages Protected Information were de-designated and were no longer subject to the Protective Orders—only 1,100 pages or so remain subject to the Protective Orders at this time. (Dkt. 421 ("Reply") at 2.) Nevertheless, in his reply Walton claims that the 10,576 pages that were de-designated were "not of much interest" to his defense anyway, and it is the very 1,100 pages that remain subject to the Protective Orders that he needs to peruse on his own. (Reply at 2.)

The drastic reduction in the amount of Protected Information undercuts Walton's argument, particularly because he still has five full months to review this more narrow set of documents. While it no doubt takes more time for defense counsel or his paralegal to show and review the documents with Defendant, (*see id.* at 6), such measures are not impractical or unduly burdensome now that the majority of documents have been de-designated. Additionally, the Protective Orders do not mandate that the Protected Information be *read to* defendants—their terms only prevent Defendants from keeping copies, so they may personally read or inspect the pages in the presence of counsel or a designated representative. (*See* Opp. at 5; Dkt. 104 ¶ 4.) The government also explains that even the 1,100 numerical page count may "overstate" the quantity of Protected Information that each defendant would have to review, since some of the documents are duplicates, some pages are more critical than others, and not all pages offer material information about *each* defendant; thus, each defense counsel could focus their clients on those pages that are more critical to each of their respective defenses. (Opp. at 10, 10 n.14.)

Next, Walton contends that the underlying purpose of preventing harm to witnesses is not served by the Protective Orders because "[w]hether a defendant possesses physical copies of discovery information, or merely learns of the information during meetings with his attorney, the well being of a cooperating witness, or his/her family members, is not influenced by how Mr. Walton learns of who are cooperating witnesses and what they had to say," especially since the identities of the witnesses "will shortly be made public over the course of the trial." (Mot. at 7.) Walton also contends that the "blanket" protection afforded by the Protective Order is not appropriate, particularly because "imaginary or possible harm should not outweigh Mr. Walton's right to have a fair trial, which would include the opportunity to have the type of access to the discovery that any person who is accused of a crime would expect." (*Id.* at 8.) However, it is not simply the identity of the cooperating witnesses, but the documents that *corroborate* their cooperation, known in the streets as "paperwork," which concern the government and the cooperating witnesses—if "paperwork" is made available to Defendants, it can be given to non-incarcerated Inglewood Family gang members to justify acts of intimidation or harm against the cooperating witnesses or their families. (Opp. at 1, 14–15; Dkt. 412 at 1; *see also United States v. Mitchell*, 1:15-cr-40-JAW-3, 2016 WL 7076991, at *3 (D. Me. Dec. 5, 2016) ("[U]nlike word of mouth, written informants' statements are concrete corroborative evidence of their cooperation with law enforcement."); *United States v. Deleon*, No. CR 15-4268 JB, 2016 WL 7242579, at *32 (D.N.M. Oct. 28, 2016) ("Hard evidence of a witness's betrayal can facilitate retaliation or intimidation of the witness[.]"); *Barbeito*, 2009 WL 3645063, at *1 ("While it is true that designating someone as a 'snitch' or a 'rat' does not generally require probable cause or documentary evidence, the danger is certainly compounded when written discovery materials identifying informants are floating about in the community . . . ."); *United States v. Palmer*, No. 10 CR. 910 JSR, 2011 WL 672412, at *1 (S.D.N.Y. Feb. 14, 2011) ("The 3500 material at issue reveals the identities of witnesses who provided the Government with highly sensitive information regarding the defendant and his friends.

. . . [M]aterial of this nature is often copied, 'passed around prisons throughout the country,' and used to retaliate against cooperators.").) Courts regularly employ protective orders with limitations on defendants' ability to possess Jencks Act material outside the presence of counsel to guard against the improper use of "paperwork." *See, e.g.*, *United States v. Garcia*, 406 F. Supp. 2d 304, 306–07 (S.D.N.Y. 2005); *Palmer*, 2011 WL 672412, at *1; *Mitchell*, 2016 WL 7076991, at *3; *Barbeito*, 2009 WL 3645063, at *1; *United States v. Rafaela-Ramirez*, No. CRIM.A 09CR00160WYD, 2009 WL 1537648, at *1 (D. Colo. May 29, 2009).

The "paperwork" concern is particularly pressing here because as the government's under seal, ex parte brief and supporting evidence (filed pursuant to Rule 16(d)) demonstrates, Defendants allegedly have significant ties, or are members of, the Inglewood Family, a violent criminal street gang. (Dkt. 412 at 3–6.) The Inglewood Family uses "paperwork" to confirm individuals' cooperation with law enforcement. (*Id.* at 8–10.) Defendants also personally know many of the cooperating witnesses, and know where they and their families live. (Opp. at 14; Dkt. 412 at 3–8.) Several of the cooperating witnesses already have allegedly received individualized death threats. (Dkt. 412 at 6–8.) The Protective Orders therefore continue to serve an important and necessary goal of protecting cooperating witnesses and their families from danger that is far from imaginary. Once the documents are disseminated, there is no way to "un-ring" that bell. The Court cannot wait until a witness is actually harmed, given the serious nature of these threats. (*See* Dkt. 412 at 6–8.) The Court finds that there is good cause for the Protective Orders, and the inconvenience and additional time needed for defense counsel to comply with the Protective Orders are not so burdensome as to rise to the level of a constitutional violation, nor do they outweigh the risks that the cooperating witnesses will face if the Protected Information is disseminated. *See United States v. Woosley*, 761 F.2d 445, 448 (8th Cir. 1985) ("Discovery matters are committed to the discretion of the trial court, and an error in administering the discovery rules will produce a reversal only

on a showing that the error was prejudicial to the substantial rights of the defendant."); *United States v. Coiro*, 785 F. Supp. 326, 330 (E.D.N.Y. 1992) ("The decision whether or not to enter such a protective order is—as with all discovery orders of a court under Rule 16—a matter for the discretion of the district court; thus, such an order will not be disturbed on review unless there is a showing of an abuse of that sound discretion. . . . [S]uch an abuse of discretion in the administration of the discovery rules will only merit reversal if the substantial rights of the defendant have been prejudiced."); *see also Stanton v. United States*, 226 F.2d 822, 823 (9th Cir. 1955) ("The term discretion when used as a guide to judicial action means sound discretion, not discretion exercised arbitrarily but with due regard for that which is right and equitable under the circumstances. It means discretion directed by reason and conscience to a just result.").

In addition, none of the circumstances that prompted the Protective Orders has changed—if anything, the risk to the cooperating witnesses may increase now that Defendants are aware of their cooperation. The government produced the Protected Information far earlier than it was obligated to specifically because the Defendants agreed to the Protective Orders. (Opp. at 22.) As the government points out, vacating the Protective Orders at this stage would "dissuade from cooperating 'those future third-party witnesses whose decision to cooperate could very well be influenced by the assurance of the Government that protective orders are appropriately issued in a given forum,'" (*id.* (citing *United States v. Johnson*, 191 F. Supp. 3d 363, 370 (M.D. Pa. 2016)), and could dissuade the government from providing discovery early in future cases, (*id.*).

Finally, Walton proposes two additional alternatives to the Protective Orders, neither of which will be effective. First, he suggests providing Defendants with copies of the Protected Information, but redacting them "so that the names could be blacked out." (Reply at 6.) This alternative does not assuage the government's valid concern about "paperwork," particularly in light of Walton's own admission in his moving papers that

"[e]ven when the documents are redacted and the names are blacked-out, it is not difficult to figure out who is providing the information." (Mot. at 7.) Walton also suggests that the Government provide Defendants with a flash drive of all discovery, rather than a portable hard drive, which Defendants could access in the MDC common rooms. (Reply at 7.) This also fails to allay the government's concerns, because Defendants could easily share the flash drives with other inmates. Defendants' conclusory statements that the Protected Information would be of "little or no interest by other inmates not charged in this case," and that "[e]ven if there were some interest in the case, it would not necessarily heighten the danger of the informants," (Reply at 7), are unpersuasive. Other inmates could have access to the proper channels to distribute the "paperwork" and endanger the cooperating witnesses.[3]

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to provide discovery (to vacate the Protective Orders) is DENIED.

DATED: March 15, 2017

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

---

[3] Tillett's attorney, John N. Aquilina, provided a declaration stating that according to Claudia Villa, who is in charge of electronic discovery provided to inmates at the Santa Ana Jail, "[i]n order to permit an inmate an opportunity to review electronic discovery, counsel must submit the discovery to Ms. Villa and the materials will be uploaded to computers in the Santa Ana Jail. . . . During the inmate's day-room time, he alone is permitted to access the electronic discovery provided by his counsel by the use of the inmate's individual user name and password. Unless additional times are available, the defendant is permitted access to the computer for one-hour per day." (Dkt. 417 at 3–4.) Mr. Aquilina's statements are inadmissible hearsay. In any event, they do not address the governments' concerns that other inmates could access the Protected Information, because an inmate could easily share his login information or show documents to other inmates in the common rooms.